JOSEPH LEWIS TETLOW,
*a/k/a Jasmine Lynn*,

    Plaintiff,

    v.

MARYLAND DEPARTMENT OF PUBLIC
SAFETY AND CORRECTIONAL
SERVICES,
MARYLAND DIVISION OF
CORRECTION,
WEXFORD HEALTH SOURCES, INC.,
MARYLAND CORRECTIONAL
TRAINING CENTER,
MARYLAND CORRECTIONAL
INSTITUTION—JESSUP,
STEPHAN MOYER, *Secretary (DPSCS)*,
DAYENA CORCORAN, *Maryland
Commissioner of Correction*,
JOHN DOE, *Warden (MCTC)*,
J. PHILIP MORGAN, *Warden (MCI-J)*,
DR. SISAY, *Medical Doctor (MCI-J)*,
EMMANUEL, *Physician Assistant (MCI-J)*,
MS. ROBERTS, *Psychologist, Psychology
Dept. (MCI-J)*,
DR. CHOUDRY, *Medical Doctor (MCTC)*,
DR. GARWOOD, *Psychologist, Psychology
Dept. (MCI-J)*
PAT GOINES-JOHNSON, *Executive
Director, Field Support Services*,
and
MS. LYN, *Social Worker Dept. (MCTC)*

    Defendants.

Civil Action No. TDC-18-1522

## MEMORANDUM OPINION

Joseph Tetlow, also known as Jasmine Lynn, is incarcerated at the Maryland Correctional

Institution in Hagerstown, Maryland ("MCIH"). Tetlow, who identifies as a transgender woman,

filed this case pursuant to 42 U.S.C. § 1983, alleging that Defendants violated her constitutional rights and federal law based on deliberate indifference and discrimination in addressing her gender dysphoria ("GD") while she was incarcerated at the Maryland Correctional Training Center ("MCTC") in Hagerstown, Maryland and the Maryland Correctional Institution in Jessup, Maryland ("MCIJ"). Defendants include Wexford Health Sources, Inc., Dr. Maksed Choudry, Dr. Yonas Sisay, and Physician's Assistant Emmanuel Esianor (collectively, "the Medical Defendants"), as well as the Maryland Department of Public Safety and Correctional Services ("DPSCS"), the Maryland Division of Correction ("DOC"), MCTC, MCIJ, Secretary of DPSCS Stephen Moyer, former Commissioner of Correction Dayena Corcoran, DPSCS Executive Director of Field Support Patricia Goins-Johnson, MCTC Warden Richard Dovey, MCIJ Warden J. Philip Morgan, Dr. Gregory Garwood, Kamala Lyn, and Zulema Roberts (collectively the "State Defendants"). Pending before the Court are three Motions to Dismiss or, in the Alternative, Motions for Summary Judgment: one filed by the State Defendants; one filed by the Medical Defendants, excluding Dr. Choudry; and one filed by Dr. Choudry in which he incorporates by reference the arguments made in the Medical Defendants' Motion. Having reviewed the Complaint and submitted materials, all three Motions will be GRANTED.

## BACKGROUND

In her Complaint, Tetlow claims that Defendants violated her constitutional rights and discriminated against her by failing to provide "adequate and equally effective medical care for her Gender Dysphoria as a transgender woman and to take effective steps to remove the risk of serious future harm." Compl. at 1, ECF No. 1. Specifically, Tetlow faults Defendants for failing to provide her with an "individual medical evaluation aimed solely at determining the appropriate treatment" for her GD under the community standards of care promulgated by the World

2

Professional Association for Transgender Health. *Id.* at 1-2. Rather, Tetlow claims that her treatment has been "a pattern of delays, inconsistencies, and seemingly endless dropping the ball." *Id.*

As alleged in the Complaint, Tetlow has GD and suffers from depression and anxiety as result of her condition. She has been denied access to female clothing, undergarments, and cosmetics. Tetlow alleges that she has not received adequate treatment for GD at both MCTC, where she was incarcerated from July 2017 to March 2018, and MCIJ, where she resided from March 2018 until the filing of the Complaint in May 2018.

## I.    DPSCS Gender Dysphoria Policy

On August 16, 2016, a DPSCS Executive Directive on the Identification, Treatment, and Correctional Management of an Inmate Diagnosed with Gender Dysphoria ("the GD Policy"), No. OPS.131.0001, took effect. Under the GD Policy, Maryland prisons are required to diagnose, treat, and manage inmates with GD, consistent with treatment, custody, and security standards. If an inmate self-identifies as having GD criteria or is referred by medical staff as possibly having GD, a mental health clinician, such as a psychiatrist, psychologist, clinical social worker, mental health counselor, or other mental health professional, is assigned to evaluate the inmate based on a face-to-face meeting and a review of available medical and mental health records in order to determine if the inmate meets the criteria for a provisional diagnosis of GD. If an inmate is provisionally diagnosed as GD, the mental health clinician forwards the case to the Regional Treatment Team, which sends it to the Regional Director of Mental Health, who arranges for an evaluation to take place within four to six weeks of the date the case was referred to the Regional Treatment Team. The contractual Regional Psychiatrist then evaluates the inmate to determine if the inmate meets

the criteria for GD. If the diagnosis is confirmed, the case is returned to the Regional Treatment Team within 30 calendar days.

If the Regional Treatment Team agrees with the diagnosis, it notifies the mental health clinician to initiate individualized treatment planning. An inmate may be referred for specialty consultations related to endocrine, urological, or gynecological services that may result in recommendations for hormone therapy. The GD Policy provides that, consistent with the inmate's security level, an inmate whose assigned gender is male and expressed gender is female is permitted to purchase and retain clothing items authorized for use by females at a female facility.

## II. MCTC

According to the Complaint, Tetlow first raised the issue of GD to MCTC officials in September 2017, when she told Defendants Kamala Lyn, an MCTC social worker, and Dr. Gregory Garwood, an MCTC psychologist, about her condition. Dr. Garwood told her in October or November 2017 that her name would be submitted for evaluation for GD. During an unrelated medical visit on November 22, 2017, Tetlow told Defendant Dr. Maksed Choudry, an MCTC physician employed by Wexford, that she would like to start hormone therapy. Dr. Choudry told Tetlow to submit a sick call request. Although Tetlow submitted such a request on November 23, 2017, there was no follow-up medical visit. However, on December 12, 2017, Tetlow had a visit with a member of the Psychology Department about her GD. Tetlow was told to write a letter to the medical department. On December 12, 2017, Tetlow sent a detailed letter to Dr. Choudry regarding her GD. The next day, Tetlow submitted a complaint about the lack of a sick call visit following her November 23, 2017 request. She also sent a letter on December 18, 2017 to Defendant Patricia Goins-Johnson at DPSCS headquarters to ask for assistance in obtaining a GD evaluation.

4

On January 2, 2018, Tetlow spoke to Dr. Garwood, who said that they would meet during the week of January 8, 2018. On January 18, 2018, Dr. Garwood met with Tetlow to discuss the evaluation process and, according to Tetlow, gave her a "preliminary diagnosis" of GD. Compl. at 15. On January 22, 2018, Tetlow sent Dr. Garwood a letter requesting female clothing. On February 14, 2018, however, Tetlow was transferred to Jessup Correctional Institution ("JCI") because a clerical error had led prison officials to believe that she would be released in October 2018, not October 2021. She was then transferred back to MCTC on February 21, 2018 and submitted a request to see Dr. Garwood. No such visit was scheduled. Then, on March 1, 2018, Tetlow submitted a request to see Lyn, with whom she met on March 13, 2018. At that time, Tetlow told Lyn that she identifies as transgender because "I am at a point in my life where I need to be real with myself and that's who I am, a transgender woman," and stated, "I now feel comfortable in expressing my real true identity." Compl. at 16. In response, Lyn told Tetlow, "You are not transgender, I don't know why people are using that term so broadly." *Id.* Lyn acknowledged, however, that she could not "tell you professionally how you identify," but told Tetlow that, in her opinion, "if you're not fully developed, then you're not transgendered." *Id.* Tetlow then ended the meeting.

**III.  MCIJ**

On March 15, 2018, Tetlow was transferred to MCIJ. On March 16, 2018, Tetlow was given a transgender strip search consent form. On April 6, 2018, Tetlow met with Defendant Zulema Roberts, a member of the MCIJ Psychology Department, to discuss why she identified as a transgender woman. On April 10, 2018, Tetlow submitted a sick call request asking for hormone therapy. In response, on April 14, 2018, Defendant Emmanuel Esianor, a physician's assistant at MCIJ employed by Wexford, met with Tetlow and referred her to Defendant Dr. Yonas Sisay. On

April 16, 2018, during a medical visit on another matter, Dr. Sisay acknowledged that Esianor had referred the hormone therapy request to him. When no immediate action was taken, Tetlow sent a letter to Goins-Johnson on April 18, 2018 complaining of discrimination and mistreatment of transgender inmates. On April 25, Tetlow submitted a complaint about not receiving a GD evaluation or hormone treatment. On May 4, 2018, during another medical visit, Dr. Sisay again acknowledged the request but did not provide hormone therapy.

On May 18, 2018, Tetlow submitted an Administrative Remedy Procedure complaint ("ARP"), No. MCIJ-0309-18, in which she claimed that she was denied medical treatment for GD. On May 21, 2018, Tetlow filed her Complaint in the present case. On May 22, 2018, Tetlow was informed that the Warden was denying her grievance because Tetlow had already been seen by mental health staff, and her case was being presented to the Gender Dysphoria Committee. On June 19, 2018, Tetlow appealed that determination to the Commissioner of Correction, who dismissed the appeal on August 6, 2018. No further appeal was filed with the Inmate Grievance Office.

## IV.    Transfer to WCI

On June 8, 2018, Tetlow was transferred to Western Correctional Institution ("WCI") in Cumberland, Maryland, which she alleges to be a maximum security prison. She was placed in a cell with a Muslim inmate who objected to being housed with a transgender cellmate. Although Tetlow was then placed in a separate cell, her new cellmate was a member of the MS-13 gang who threatened her with an ice pick. When she informed correctional officers about this incident, one of the officers told her that he knew that MS-13 members did not like homosexuals, but "I didn't know they don't like transgenders." Supp. Compl. ¶ 19, ECF No. 25.

On June 9, 2018, Tetlow filed ARP No. WCI-1288-18, alleging that she was transferred to WCI for no legitimate reason. On June 2, 2018, the ARP was denied for procedural reasons because additional information was needed to investigate the claim. On June 15, 2018, Tetlow filed a supplement to the Complaint alleging that the transfer to WCI violated her First Amendment right to freedom of speech because it was ordered by Defendants Commissioner Corcoran and MCIJ Warden Morgan in retaliation for her filing of an ARP and the Complaint in the present case alleging that her lack of GD treatment was unconstitutional and unlawful. On June 23, 2018, Tetlow filed another ARP, No. WCI 1399-18, alleging that she was transferred to WCI in retaliation for filing her earlier ARP complaining about the lack of a GD evaluation and for filing the present federal lawsuit. That ARP was dismissed on the grounds that an inmate may not request relief for an institutional transfer through the ARP process. On August 29, 2018, Tetlow was transferred to Roxbury Correctional Institution in Hagerstown, Maryland.

## V.    Procedural History

In the Complaint, Tetlow alleges that by failing to provide a GD evaluation and hormone therapy, Defendants violated her Eighth Amendment right against cruel and unusual punishment; the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101-12213 (2012); and the Rehabilitation Act, 29 U.S.C. §§ 701-796 (2012). In the June 15, 2018 supplement, Tetlow added the First Amendment retaliation claim against Commissioner Corcoran and Warden Morgan. Tetlow seeks declaratory relief of an unstated nature; injunctive relief ordering a GD evaluation, hormone therapy, and immediate treatment recommended by a gender specialist; and compensatory and punitive damages.

**DISCUSSION**

## I.     Preliminary Motions

Before turning to Defendants' dispositive motions, the Court first addresses Tetlow's currently pending preliminary motions: a Motion to Seal and Strike Medical Documentation, a Motion to File a Surreply, a Motion to Correct the Record, a Motion for Discovery, and a Motion for Appointment of Counsel.

### A.     Motion to Seal and Strike

In this motion, Tetlow requests that the Court strike the medical records filed by Defendants with their dispositive motions because the records have not been authenticated, constitute inadmissible hearsay, and are not relevant. Under Federal Rule of Civil Procedure 56, an affidavit or declaration supporting a motion for summary judgment "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). A court may strike portions of affidavits that do not meet these requirements. *See Evans v. Tech. Applications & Serv. Co.*, 80 F.3d 954, 962 (4th Cir. 1996). By analogy, Tetlow asks the Court to strike records that run afoul of these requirements.

Here, the medical records are plainly relevant to Tetlow's claims regarding inadequate medical treatment and are thus subject to use in the litigation. *See Felder v. Wyman*, 139 F.R.D. 85, 88 (1991) ("Where, as here, plaintiff has attacked the quality of decedent's medical treatment and placed decedent's medical condition into contention, any privilege that might exist to disclosure with respect to decedent's medical condition is waived."). The records have been authenticated through the declaration of Dr. Erwin Aldana, who has attested that the records are "true and accurate and maintained by Wexford in the ordinary course of business." Aldana Aff. ¶

8

2, ECF No. 57-5. From that and other statements in affidavits, and the records themselves, the Court concludes, for purposes of the motion, that they constitute business records under Federal Rule of Evidence 803(6) and thus present facts in the form of admissible evidence. The statements by Tetlow contained in the medical records are separately admissible as admissions of a party opponent, Fed. R. Evid. 801(d)(2)(A), as well as, in certain instances, as statements made for medical diagnosis or treatment, Fed. R. Evid. 803(4). The Motion to Strike will be denied.

Tetlow's Motion to Seal, however, will be granted. Where the records contain "sensitive medical or personal identification information," and there is no countervailing interest in making them publicly available, the Court may appropriately order them docketed under seal. *See Briggs v. Marriott Int'l, Inc.*, 368 F. Supp. 2d 461, 463 n.1 (D. Md. 2005) (sealing medical records); *Rock v. McHugh*, 819 F. Supp. 2d 456, 475 (D. Md. 2011). Thus, the Motion will be granted as to the request to seal but denied as to the request to strike the medical records.

## B. Motion for Leave to File a Surreply

In this motion, Tetlow seeks to file a surreply brief on the Motions to Dismiss or, in the Alternative, Motions for Summary Judgment. In this District, a surreply brief is not permitted absent leave of the Court. D. Md. Local R. 105.2(a). Tetlow does not seek an opportunity to respond to a new argument raised by Defendants for the first time in their reply briefs. *See Lewis v. Rumsfeld*, 154 F. Supp. 2d 56, 61 (D.D.C. 2001). Rather, she appears to seek to provide new information based on recent events. Where such information would require providing Defendants with an opportunity to respond, the Court concludes that such unending briefing is not warranted and will only delay resolution of the dispositive motions. The Motion for Leave to File a Surreply will be denied.

### C.    Motion to Correct the Docket

In this Motion, Tetlow requests that the docket reflect that she made a demand for a jury trial. Where Tetlow made such a demand in her Complaint, the Court will grant the motion. The Court need not and does not address whether Tetlow is entitled to a jury trial.

### D.    Motion for Discovery

Although docketed as a Motion for Discovery, Tetlow's January 7, 2019 filing relating to discovery is entitled "Rule 56(d) Declaration of Joseph L. Tetlow a/k/a Jasmine Lynn" and thus is properly construed as an affidavit pursuant to Federal Rule of Civil Procedure 56(d) in which Tetlow explains why summary judgment should not be granted before she has had the opportunity to take certain discovery. ECF No. 68. Whether summary judgment can be granted without discovery will be addressed below. *See infra* part II. To the extent that this filing can be construed as a motion seeking immediate discovery, the motion will be denied because, for the reasons stated below, all claims will be dismissed.

### E.    Motion for Appointment of Counsel

Tetlow has also filed a Motion for Appointment of Counsel to represent her in this case. "The court may request an attorney to represent any person" proceeding *in forma pauperis* who is "unable to afford counsel." 28 U.S.C. § 1915(e)(1) (2012). In civil actions, the Court appoints counsel only in exceptional circumstances. *Cook v. Bounds*, 518 F.2d 779, 780 (4th Cir. 1975). In doing so, the Court considers "the type and complexity of the case," whether the plaintiff has a colorable claim, and the plaintiff's ability to prosecute the claim. *See Whisenant v. Yuam*, 739 F.2d 160, 163 (4th Cir. 1984) (citations omitted), *abrogated on other grounds by Mallard v. U.S. Dist. Ct. for the S. Dist. of Iowa*, 490 U.S. 296 (1989). Exceptional circumstances include a litigant who "is barely able to read or write," *id.* at 162, or clearly "has a colorable claim but lacks the

capacity to present it." *Berry v. Gutierrez*, 587 F. Supp. 2d 717, 723 (E.D. Va. 2008); *see also Altevogt v. Kirwan*, No. WDQ-11-1061, 2012 WL 135283, at *2 (D. Md. Jan. 13, 2012). Inherent in this analysis is that one's indigence is insufficient to establish exceptional circumstances. Here, Tetlow has demonstrated that she can adequately articulate her claims, and the Court finds no exceptional circumstances to warrant appoint of counsel. The Motion for Appointment of Counsel will therefore be denied.

## II.     Motions to Dismiss or, in the Alternative, Motions for Summary Judgment

### A.     Legal Standards

Defendants' Motions are styled as motions to dismiss, under Federal Rule of Civil Procedure 12(b)(6) or, in the alternative, for summary judgment, under Rule 56. Fed. R. Civ. P. 12(b)(6), 56. To defeat a motion to dismiss under Rule 12(b)(6), the complaint must allege enough facts to state a plausible claim for relief. *Iqbal*, 556 U.S. at 678. A claim is plausible when the facts pleaded allow "the Court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Although courts should construe pleadings of self-represented litigants liberally, *Erickson v. Pardus*, 551 U.S. 89, 94 (2007), legal conclusions or conclusory statements do not suffice, *Iqbal*, 556 U.S. at 678. The Court must examine the complaint as a whole, consider the factual allegations in the complaint as true, and construe the factual allegations in the light most favorable to the plaintiff. *Albright v. Oliver*, 510 U.S. 266, 268 (1994); *Lambeth v. Bd. of Comm'rs of Davidson Cty.*, 407 F.3d 266, 268 (4th Cir. 2005).

Typically, when deciding a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court considers only the complaint and any attached documents "integral to the complaint." *Sec'y of State for Defence v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007). Rule 12(d) requires courts to treat such a motion as a motion for summary judgment where

matters outside the pleadings are considered and not excluded. Fed. R. Civ. P. 12(d). Before converting a motion to dismiss to one for summary judgment, courts must give the nonmoving party "a reasonable opportunity to present all the material that is pertinent to the motion." *Id.* "Reasonable opportunity" has two requirements: (1) the nonmoving party must have some notice that the court is treating the Rule 12(b)(6) motion as a motion for summary judgment, and (2) the nonmoving party "must be afforded a reasonable opportunity for discovery" to obtain information essential to oppose the motion. *Gay v. Wall*, 761 F.2d 175, 177 (4th Cir. 1985) (internal citation omitted).

Here, the notice requirement has been satisfied by the title of Defendants' Motions. To show that a reasonable opportunity for discovery has not been afforded, the nonmoving party must file an affidavit or declaration under Rule 56(d), or comparable filing, explaining why "for specified reasons, it cannot present facts essential to justify its opposition." Fed. R. Civ. P. 56(d). *See Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 245 (4th Cir. 2002). Tetlow has submitted a detailed Rule 56(d) affidavit seeking several categories of information that she asserts are needed before she can fairly oppose a motion for summary judgment. Although the list of categories of discovery appears to be overbroad, the Court agrees that as to the claim of a violation of the Eighth Amendment based on deliberate indifference to a serious medical need, summary judgment is premature where the possible existence of additional relevant records, such as those containing communications among health care professionals or with Tetlow, has yet to be established. Accordingly, as to that issue, the Court will construe the Motion as a Motion to Dismiss under Rule 12(b)(6) and will not consider the submitted exhibits, with the exception of the GD Policy, which is referenced throughout the Complaint and is therefore integral to it. *See Trimble Navigation*, 484 F.3d at 705. The Rule 56(d) declaration, however, provides no basis to

conclude that discovery on the issue of exhaustion of administrative remedies is necessary before addressing that issue. Accordingly, the Court will consider the State Defendants' Motion as seeking summary judgment as to that issue.

Under Federal Rule of Civil Procedure 56, the Court grants summary judgment if the moving party demonstrates that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In assessing the motion, the Court views the facts in the light most favorable to the nonmoving party, "with all justifiable inferences" drawn in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The Court may rely only on facts supported in the record, not simply assertions in the pleadings. *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. A dispute of material fact is only "genuine" if sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party. *Id.*

## B.     State Defendants

The State Defendants assert they are entitled to dismissal of the claims against them based on Eleventh Amendment immunity or the inapplicability of § 1983 to state entities, a lack of allegations supporting supervisory liability, the inapplicability of the Americans with Disabilities Act and Rehabilitation Act, the failure to exhaust administrative remedies, and qualified immunity. Where Defendants' argument relating to qualified immunity consists only of a statement of the general legal standard for qualified immunity and includes no substantive analysis of the facts of this case or the law specifically applicable to such facts, the Court will not consider that argument.

### 1. Entity Defendants

The State Defendants argue that all claims against DPSCS, DOC, MCTC, and MCIJ must be dismissed because these entities are not "persons" subject to suit under § 1983. Section 1983 authorizes a plaintiff to bring a suit for damages against any "person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution." 42 U.S.C. § 1983. As state agencies or parts of state agencies, DCSCS, DOC, MCTC, and MCIJ are not "persons" within the meaning of § 1983 and are therefore not subject to suit under that provision. *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989). Under the same reasoning, all claims against the other State Defendants in their official capacities will also be dismissed because a suit against a state official in that individual's official capacity is the equivalent of a suit against the state. *Id.* Thus, the Motion will be granted as to all claims against DPSCS, DOC, MCTC, and MCIJ.

### 2. Supervisory Liability

The State Defendants argue that Defendants Moyer, Corcoran, Goins-Johnson, Morgan, and Dovey cannot be held liable because the doctrine of *respondeat superior*, or vicarious liability, does not apply to § 1983 claims. *See Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004). Liability of supervisory officials "is premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'" *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001) (quoting *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984)). Supervisory liability under § 1983 must be supported with evidence that: (1) the supervisor had actual or constructive knowledge that a subordinate was engaged in conduct that posed a pervasive and unreasonable

risk of constitutional injury to citizens like the plaintiff; (2) the supervisor's response to the knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff. *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994).

In the Complaint, there are no allegations that Moyer personally participated in the events underlying Tetlow's claims, or that he had any knowledge of the relevant events. The claims against Moyer therefore will be dismissed. Although Commissioner Corcoran, Goins-Johnson, Warden Morgan, and Warden Dovey did not personally participate in any of the allegedly improper acts or omissions, Tetlow has asserted that she sent letters, ARPs, or appeals to these Defendants informing them of the alleged unconstitutional delays in her treatment for GD. Although receipt of such claims would not necessarily establish liability, the Court concludes that, at the motion to dismiss stage, it is premature to conclude that no supervisory liability can be established as to these Defendants. The Court therefore will not dismiss them from the case on this basis.

### 3. ADA and Rehabilitation Act

The State Defendants seek dismissal of Tetlow's claims under the ADA and the Rehabilitation Act. The ADA explicitly excludes certain conditions from its definition of disability, including "transsexualism" and "gender identity disorders not resulting from physical impairments." 42 U.S.C. § 12211(b). The Rehabilitation Act likewise excludes from the Act's coverage "transsexualism" and "gender identity disorders not resulting from physical impairments." 29 U.S.C § 705(20)(E), (F). Where Tetlow has not offered any argument on how her condition is not excluded by these terms, the Court will grant the Motion as to the ADA and

Rehabilitation Act claims. *See, e.g., Johnson v. Fresh Mark, Inc.*, 337 F. Supp. 2d 996, 1001 (N.D. Ohio 2003) (holding that gender identity disorder is not a disability under the ADA based on "the plain language of the statute"), *aff'd*, 98 F. App'x 461 (6th Cir. 2004).

### 4. Exhaustion of Administrative Remedies

The State Defendants assert the affirmative defense that Tetlow has failed to exhaust administrative remedies. Under the Prison Litigation Reform Act of 1995 ("PLRA"), Pub. L. No. 104-134 § 803, 110 Stat. 1321 (1996) (codified as amended at 42 U.S.C. § 1997e(a)):

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a). Inmates must exhaust administrative remedies before they bring any "suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002).

Exhaustion is mandatory and generally may not be excused unless the administrative procedure is not available. *See Ross v. Blake*, 136 S. Ct. 1850, 1858 (2016) (holding that an inmate "must exhaust available remedies, but need not exhaust unavailable ones"). "[A]n administrative remedy is not considered to have been available if a prisoner, through no fault of his own, was prevented from availing himself of it." *Moore v. Bennette*, 517 F.3d 717, 725 (4th Cir. 2008). In *Ross*, the United States Supreme Court identified three circumstances when an administrative remedy is unavailable. An administrative procedure is not available when officers are consistently unwilling or unable to provide relief to aggrieved inmates, the procedure is so opaque that it is practically incapable of use, or prison administrators actively thwart inmates from filing grievances. *Ross*, 136 S. Ct. at 1859-60.

In Maryland prisons, for grievances against Division of Correction personnel, the Administrative Remedy Procedure ("ARP") is the administrative process that must be exhausted. *See generally* Md. Code Ann., Corr. Servs. §§ 10-201 to -210 (West 2002); Md. Code Regs. ("COMAR") 12.02.28.02(B)(1) (2018) (defining the ARP); COMAR 12.07.01.01(B)(8) (defining an ARP "grievance" to include a "complaint of any individual in the custody of the [DOC] . . . against any officials or employees of the [DOC] . . . arising from the circumstances of custody or confinement"). First, a prisoner must file a grievance, known as an "ARP," with the warden of the prison within 30 days of the incident or when the prisoner gains knowledge of the injury giving rise to the complaint. Second, if the ARP is denied, a prisoner must file an appeal with the Commissioner of Correction within 30 days. If the appeal is denied, the prisoner must appeal within 30 days to the Inmate Grievance Office ("IGO"). *See* Md. Code. Ann., Corr. Servs. § 10–206(a). ("[I]f an individual confined in a correctional facility in the Division of Correction . . . has a grievance against an official or employee of the Division of Correction . . . the individual may submit a complaint to the Office within the time and in the manner required by regulations adopted by the Office."); COMAR § 12.07.01.05(B). Inmates may seek judicial review of the IGO's final determinations in a Maryland Circuit Court. Md. Code Ann., Corr. Servs. § 10–210. The ARP process does not apply to case management decisions, including assignments to specific prisons, which are to be directly grieved to the IGO. COMAR §§ 12.02.28.04(B)(1); 12.07.01.04(B)(9)(c).

Here, the State Defendants have established that Tetlow did not exhaust administrative remedies before initiating this suit. Tetlow filed a number of ARPs relating to certain allegations raised in the Complaint. In ARP No. MCIJ-0309-18, submitted on May 18, 2018, Tetlow claimed that she was denied medical treatment for GD. On June 21, 2018, the Warden denied the grievance by stating that Tetlow had already been seen by mental health staff and that her case was being

presented to the Gender Dysphoria Committee. The Warden stated that Tetlow was informed of this result on May 22, 2018. On June 19, 2018, Tetlow appealed that determination to the Commissioner of Correction, who dismissed it on August 6, 2018. No appeal was filed with the IGO.

Tetlow filed two other ARPs relating to her transgender status, including ARP No. MCIJ 0287-18, filed on May 8, 2018, in which Tetlow complained that she was improperly searched as a transgender inmate and requested, among other things, a GD evaluation. On July 3, 2018, the Warden responded that the strip search policy was under review and no action was warranted. The Commissioner dismissed the appeal on August 6, 2018. Tetlow filed ARP No. WCI-1293-18, in which she claimed that on June 8, 2018, after she had filed the Complaint in this case, she informed the Housing Unit Officer of her transgender status and requested a private shower. After the ARP was dismissed, Tetlow appealed the decision to the Commissioner on July 17, 2018, who dismissed the appeal on August 14, 2018. Neither of these decisions was appealed to the IGO.

On the issue of an allegedly retaliatory transfer, Tetlow filed ARP No. WCI-1288-18 on June 10, 2018, asserting that she was transferred to WCI for no legitimate reason. The ARP was denied for procedural reasons because additional information was needed to investigate the claim. On June 23, 2018, Tetlow filed ARP No. WCI 1399-18, alleging that she was transferred to WCI in retaliation for filing an ARP complaining about her lack of a GD evaluation and for filing the present federal lawsuit. That ARP was dismissed on the grounds that an inmate may not request relief for an institutional transfer through the ARP process. A claim relating to a prison transfer may, however, be pursued at the IGO. *See* COMAR § 12.07.01.04(B)(9)(c). Tetlow did not file such a claim with the IGO.

In none of these instances did Tetlow appeal the ARP determinations to the IGO. Based on the declaration of Samiyah Hassan, an IGO official, Tetlow had not filed any appeals or grievances with the IGO as of July 26, 2018, two months after the Complaint in this case was filed. Accordingly, Tetlow's claims against the State Defendants, relating both to their alleged failure to treat her GD and to the alleged retaliatory transfer, are subject to dismissal.

Tetlow does not dispute her failure to present her claims to the IGO or assert facts to support a claim that administrative remedies were unavailable to her under *Ross*. Rather, she argues that the Court should exercise "its discretion of the equitable nature," to reject the defense, pursuant to *Washington v. FBI*, No. 5:16-3913 BHH, 2018 WL 6061039 (D.S.C. Nov. 20, 2018). In *Washington*, a blind inmate suffering from painful degenerative ocular disease filed suit under the Eighth Amendment for deliberate indifference to a serious medical need based on his claims that his frequent transfers between correctional facilities deprived him of the ability to establish a therapeutic relationship with an ophthalmologist and subjected him to irreparable harm. *Id.* at *1. Although the court invoked its "equitable power" to grant Washington's motion for a preliminary injunction, even when it appeared that administrative remedies had not been exhausted, to prevent irreparable injury before the conclusion of the case, *id.* at *4, the court later granted a motion to dismiss based on the failure to exhaust, *Washington v. FBI*, No. 5:16-cv-03913-BHH-KDW, 2019 WL 2125246, at *6 (D.S.C. Jan. 3, 2019).

Here, the Court has already considered and denied Tetlow's request for a preliminary injunction. There is no dispute that Tetlow did not exhaust administrative remedies. Indeed, she filed her Complaint in this Court on May 24, 2018, before she even filed any appeals of her ARPs to the Commissioner of Correction. Accordingly, the Court will dismiss without prejudice Tetlow's remaining claims against the State Defendants. *See, e.g.*, *McKinney v. Carey*, 311 F.3d

1198, 1199–1200 (9th Cir. 2002) (holding that the PLRA requires exhaustion before the suit is filed, consistent with holdings in the First, Second, Third, Seventh, Tenth, Eleventh, and D.C. Circuits); *Freeman v. Francis*, 196 F.3d 641,645 (6th Cir. 1999) (same); *Perez v. Wis. Dep't of Corr.*, 182 F.3d 532, 534-35 (7th Cir. 1999) (same).

### C.    Medical Defendants

The Medical Defendants seek dismissal of the claims against them on the grounds that:  (1) Wexford cannot be held liable because there are no plausible allegations of a custom or policy of deliberate indifference to the need for GD evaluation and treatment; and (2) the allegations against the three individual Medical Defendants are insufficient to state a valid Eighth Amendment claim. To the extent that Tetlow argues, in her memorandum in opposition to the Motions, that the Medical Defendants were also deliberately indifferent for failing to properly treat her chronic folliculitis and related skin issues, that claim is not asserted in the Complaint or the supplement to the Complaint and therefore will not be considered. *See Zachair Ltd. v Driggs*, 965 F. Supp. 741, 748 n.4 (D. Md. 1997) (stating that a plaintiff "is bound by the allegations contained in its complaint and cannot, through the use of motion briefs, amend the complaint"), *aff'd*, 141 F.3d 1162 (4th. Cir. 1998); *Mylan Laboratories, Inc. v. Akzo, N.V.*, 770 F. Supp. 1053, 1068 (D. Md. 1991) (stating that "it is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss").

In order to state an Eighth Amendment claim arising from inadequate medical care, a plaintiff must demonstrate that the actions of the defendants or their failure to act amounted to deliberate indifference to a serious medical need. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976). Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff was

aware of the need for medical attention but failed to either provide it or ensure the needed care was available. *See Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008).

Objectively, the medical condition at issue must be serious. *Hudson v. McMillian*, 503 U.S. 1, 9 (1992). A medical condition is serious when it is "so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Iko*, 535 F.3d at 241 (citation omitted). As for the subjective component, "[a]n official is deliberately indifferent to an inmate's serious medical needs only when he or she subjectively knows of and disregards an excessive risk to inmate health or safety." *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). "[I]t is not enough that an official should have known of a risk; he or she must have had actual subjective knowledge of both the inmate's serious medical condition and the excessive risk posed by the official's action or inaction." *Jackson*, 775 F.3d at 178 (citations omitted). "[M]any acts or omissions that would constitute medical malpractice will not rise to the level of deliberate indifference." *Id.* Thus, "[d]eliberate indifference is more than mere negligence, but less than acts or omissions done for the very purpose of causing harm or with knowledge that harm will result." *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016) (internal alterations omitted). Under this standard, a mere disagreement between an inmate and a physician over the appropriate level of care does not establish an Eighth Amendment violation absent exceptional circumstances. *Id.* Moreover, if the requisite subjective knowledge is established, an official may avoid liability "if [he] responded reasonably to the risk, even if the harm ultimately was not averted." *See Farmer v. Brennan*, 511 U.S. 825, 844 (1994).

### 1. Wexford

Wexford is a private corporation that, at the time of the events in question, had a contract to provide health care to Maryland inmates. An entity such as Wexford may be held liable under

§ 1983 only to the extent that it has a custom or policy that causes a violation of the Constitution or laws of the United States, such as a policy of deliberate indifference to serious medical needs. *See Austin v. Paramount Parks, Inc.*, 195 F.3d 715, 727–28 (4th Cir. 1999); *Monell v. Dep't of Soc. Servs. of the City of New York*, 436 U.S. 658, 690–91 (1978). Here, the Complaint does not allege, and does not provide sufficient facts to support, that Wexford has such a custom or policy. Accordingly, the Motion will be granted as to Wexford, which will be dismissed as a defendant.

## 2.    Individual Medical Defendants

Although Tetlow alleges that the failure to provide her with a diagnosis and treatment for GD over a period of months leading up to the filing of her Complaint in May 2018 constituted deliberate indifference to a serious medical need, she does not allege sufficient facts as to each of the individual Medical Defendants to state a plausible claim that the Defendant personally violated Tetlow's constitutional rights. Significantly, the time period of alleged delay in treatment is fairly divided into two different parts involving different personnel. During the first period, from September 2017 to March 15, 2018, Tetlow was housed at MCTC and was seen by Dr. Garwood, Lyn, and Dr. Choudry. During the second period, from March 15, 2018 to May 24, 2018, Tetlow was incarcerated at MCIJ and was seen by Roberts, Esianor, and Dr. Sisay. Neither Esianor nor Dr. Sisay had any role in Tetlow's treatment at MCTC. Likewise, Dr. Choudry had no role or involvement in Tetlow's treatment at MCIJ. Where there is no allegation that the transfers to JCI and MCIJ were inappropriate, the fact that the transfers necessarily interrupted, and effectively required a restart of, the process of securing a GD evaluation and hormone treatment cannot fairly be attributed to any of the three individual Medical Defendants.

As to Dr. Choudry, Tetlow has alleged that on November 22, 2017, during a medical visit for an unrelated matter, she told Dr. Choudry that she wanted hormone therapy. Dr. Choudry

asked Tetlow to submit a sick call request on that topic. Although Tetlow asserts that Dr. Choudry did not respond to her November 23, 2017 sick call request, or to a follow-up letter sent on December 12, 2017, Tetlow's request did not go unaddressed. In January 2018, Tetlow discussed the matter with Dr. Garwood on several occasions and, according to Tetlow, received a preliminary diagnosis of GD. Dr. Garwood, not Dr. Choudry, was clearly the mental health clinician who, under the GD Policy, was required to evaluate Tetlow. Where none of Tetlow's interactions in 2018 with MCTC health care professionals about GD involved Dr. Choudry, Tetlow's claim against Dr. Choudry is effectively that the delay of several weeks in addressing her November 23, 2017 sick call request amounted to deliberate indifference to a serious medical need. Even assuming that Tetlow's condition was such that she had an objectively serious medical need, she has not alleged sufficient facts to support a finding that Dr. Choudry was subjectively aware that a delay of approximately a month in arranging for Dr. Garwood, the appropriate Mental Health Clinician, to follow up with Tetlow, created a substantial risk to Tetlow's health and safety. Indeed, the GD Policy contemplates an evaluation process that could extend multiple months. In the absence of any allegations that Dr. Choudry was informed of the impact that such a limited delay would have on Tetlow, or that Dr. Choudry had any reason to deliberately delay an evaluation, the Court concludes that Tetlow has not asserted sufficient facts to state a plausible claim of deliberate indifference by Dr. Choudry.

As for the Medical Defendants who worked at MCIJ, the allegations against Esianor are insufficient to state a claim for deliberate indifference. According to the Complaint, all Esianor did was receive a sick call request for hormone therapy on April 14, 2018 and pass it on to Dr. Sisay. That singular fact refutes, rather than advances, a claim of deliberate indifference. The allegations against Dr. Sisay, like those against Dr. Choudry, are limited to an apparent failure to

immediately address a sick call request seeking hormone therapy that, under the GD Policy, would have to be referred to a mental health clinician for evaluation. Dr. Sisay received that request on April 16, 2018 and twice acknowledged to Tetlow that he was aware of the request. There is, however, no allegation that Dr. Sisay was a mental health clinician or had any direct responsibility for any aspect of the decision whether to evaluate a prisoner for GD or to initiate hormone therapy, nor are there any allegations that Dr. Sisay was informed of the impact that a lack of immediate response would have on Tetlow, or that Dr. Sisay had any reason to deliberately delay an evaluation. Under these circumstances, the Court concludes that, standing alone, the approximate one-month failure to provide a response to Tetlow before Tetlow initiated this federal lawsuit does not support a finding of that Dr. Sisay acted with deliberate indifference to a serious medical need. Accordingly, the Motion will be granted to as to Defendants Choudry, Esianor, and Sesay.

**CONCLUSION**

For the foregoing reasons, the State Defendants' Motion to Dismiss or, in the Alternative, Motion for Summary Judgment, will be GRANTED. The claims against Defendants DPSCS, the Maryland Division of Correction, the Maryland Correctional Training Center, and the Maryland Correctional Institution-Jessup, and the claims under the ADA and Rehabilitation Act against all Defendants, will be DISMISSED WITH PREJUDICE. The remaining claims against the remaining State Defendants will be DISMISSED WITHOUT PREJUDICE. The Medical Defendants' Motions to Dismiss or, in the Alternative, Motions for Summary Judgment, will be GRANTED. The claims against Wexford Health Sources, Inc. will be DISMISSED WITH PREJUDICE. The claims against the remaining Medical Defendants will be DISMISSED WITHOUT PREJUDICE. A separate Order shall issue.

Date: September 24, 2019

THEODORE D. CHUANG
United States District Judge